Filed 5/23/14  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071933 |
| v. | (Super. Ct. No. 11F5308) |
| MICHAEL DEREK JOHNSON, | |
| Defendant and Appellant. | |

A jury convicted defendant Michael Derek Johnson of attempted robbery in concert (Pen. Code, §§ 664/211, 212.5, subd. (a) -- count 1),[1] residential burglary (§ 459 -- count 2), assault with a deadly weapon (§ 245, subd. (a)(1) -- count 4), three counts of assault with a firearm (§ 245, subd. (a)(2) -- counts 3, 5, and 10), two counts of false imprisonment by force (§§ 236, 237, subd. (a) -- counts 6 and 7), battery with serious

_____

[1] Undesignated statutory references are to the Penal Code.

1

bodily injury (§ 243, subd. (d) -- count 8), and attempted false imprisonment (§§ 664/237 -- count 11), with enhancements for being armed with a firearm (a rifle) as to each count (§ 12022, subd. (a)(1)). The trial court sustained two prior prison term allegations (§ 667.5, subd. (b)) and sentenced defendant to 14 years eight months in state prison.

On appeal, defendant contends the trial court violated his right to confrontation and right to a fair trial when it allowed a previously convicted codefendant to be called as a witness but refuse to testify. Defendant also contends the consecutive sentences on counts 3 through 7, 10, and 11 violated the section 654 prohibition against multiple punishment.

We conclude the trial court did not violate defendant's right to confrontation or right to a fair trial, but the sentences on counts 3, 6, 7 and 11 must be stayed pursuant to section 654. We have also identified a clerical error on the abstract of judgment. We will modify the judgment, affirm the judgment as modified, and order a correction to the abstract of judgment.

## BACKGROUND

Defendant met with Michael Houchins[2] and Lucas Simpson at a Red Bluff bar in August 2011. Defendant and Houchins had known each other while living in Red Bluff; Houchins had known Simpson for 18 years. Simpson told defendant and Houchins that he had been posing as a law enforcement officer to rob people of their drugs. He asked Houchins to help him find someone to rob in that manner.

Houchins had an acquaintance named Michael High who grew medical marijuana and lived alone in a secluded residence in Shasta Lake City. While visiting High on August 28, 2011, Houchins saw about 30 pounds of marijuana on High's living room

---

[2] Houchins admitted prior felony convictions for domestic violence and criminal threats. He entered into a plea agreement in which he agreed to testify. He expected to receive probation for the crimes in this case even though he had a prior strike conviction.

floor. Houchins called Simpson the next day and suggested High as an easy target for a robbery. Houchins also told Chane Finch, who agreed to participate in a plan to take High's marijuana.

On August 29, 2011, Houchins met with Simpson and defendant and gave them money to buy zip ties. Later that day, Finch, Houchins, Simpson, and defendant met at Finch's house to plan the crime. Houchins would go to High's place and would contact the others after he was inside. Finch, Simpson, and defendant would then go to High's house and steal the marijuana.

Houchins and Finch went into Finch's garage and injected morphine. Defendant and Simpson put on camouflage clothing and handkerchief masks. Simpson also put on a "stab vest" and showed the men a Mini-14 rifle. Finch was already wearing dark clothing and a "tactical vest"; he also had a Glock 19 nine-millimeter handgun and a fake marshal's badge.

The group departed in three cars. The car with Finch and his girlfriend, and the car with Simpson and defendant, split off from the car driven by Houchins and waited for Houchins to contact them by text message.

Houchins arrived at High's residence between 9:00 and 11:00 p.m. He went inside and watched High play video games. Two close friends of High -- Isabella Vasquez and Amanda Baxter -- were also present. They were going to care for High's dog while High was out of town. Baxter brought her pit bull to High's house.

Eventually, Houchins sent a text message to Simpson telling him it was time to begin. The dogs began to bark and ran outside. When the dogs did not return, High and Vasquez went outside. They were confronted by Finch, Simpson, and defendant, who yelled, "DEA" and "Search warrant, get down on the ground."

One of the intruders struck High in the head with a rifle. High did not think the intruders were law enforcement and suspected they wanted to steal his marijuana. At least two of the intruders then started to beat High. When the beating stopped, High

3

lunged at the closest attacker. High placed the man in a chokehold, grabbed him around the torso with his legs, and brought him to the ground. Baxter's dog joined the fight; one of the intruders threatened to shoot the dog unless someone stopped it. Vasquez grabbed the dog and held it.

Baxter had remained inside the house. When she approached the front door she saw the intruders attacking High. She turned and ran toward the back door, but the man with the rifle went inside, grabbed her, pulled her to the floor and told her to stay there. Baxter ran outside, however, where she was struck with a rifle and fell next to Vasquez.

High was still choking the intruder he had wrestled to the ground. One of the other intruders said, "Let him go or I'll fucking shoot [you]." High also became aware that the man he was wrestling had unsheathed a knife. High told the man not to "stick" him and pushed the man away to create distance between them. But the intruders resumed their attack on High. High stopped fighting and one of the intruders attempted to put a zip tie around High's wrists.

Nonetheless, High was concerned for the safety of Baxter and Vasquez. He stood up, swung his arm to spread the three intruders, went after the man he had choked and pursued him down the driveway. During the pursuit High saw Houchins's car drive away. When High closed in on the man he was pursuing, the man fired two shots at High from a handgun but missed. High tackled the man and kicked him in the face.

High stopped kicking the intruder and used him as a shield. One of the other intruders struck High with a two-by-four. High released the man he had been holding and grabbed the board. High and the other intruder struggled over the board until High got control and tried to swing it at the intruders. The intruder who lost the board ran down the driveway.

High returned to the house. The remaining intruder was there holding Vasquez and Baxter. When High arrived, the intruder ran down the driveway. High tried to

4

pursue the man but realized he was bleeding from a stab wound. High stumbled back to the house. Vasquez and Baxter called 911.

Houchins testified that he drove away during the attack. Before leaving, he heard two gunshots and saw Finch carrying a pistol and defendant carrying a knife. Houchins was arrested the day after the attack. He told the police several false stories before negotiating a plea agreement and testifying at trial.

Simpson pleaded guilty to attempted robbery in concert and assault with a firearm. He agreed to testify in exchange for a one-year reduction in his sentence. Simpson testified that he participated in the attempted robbery with defendant, Finch, and Houchins. He said he had a rifle, defendant had an eight-inch knife, and Finch had a nine-millimeter handgun. High hit Simpson and knocked him down. Finch and defendant fought with High; Finch pulled out the handgun and defendant drew the knife. High then jumped up and chased them down the driveway while Finch fired at him. The intruders drove away.

Forrest Hanson was a convicted felon who shared a county jail cell with Houchins from mid-October to the beginning of November. Houchins told Hanson he was in custody for robbery and wanted to testify so he would not get in trouble. Houchins needed to know where the pancreas was because he had told the police he saw the stabbing.

DISCUSSION

I

Defendant contends the trial court violated his right to confrontation and right to a fair trial when it allowed a previously convicted codefendant, Finch, to be called as a witness but decline to testify.

Defendant was initially tried with Finch. The jury convicted Finch but deadlocked six to six on defendant's guilt. On retrial, the prosecution sought to have Finch take the stand whether or not he intended to testify. Defense counsel objected: assuming Finch

5

would refuse to testify, the lack of testimony foreclosed relevance and created a substantial risk of prejudice to defendant. The trial court suggested that the prosecution not mention the matter in its opening statement, and the prosecution agreed. Later, the prosecution informed the trial court that Finch would be granted immunity and that he had not yet been sentenced.

At a subsequent Evidence Code section 402 hearing, defense counsel argued that regardless of any grant of immunity, Finch's refusal to testify had little probative value and was prejudicial. Defense counsel also argued that allowing the jury to draw inferences from Finch's failure to testify violated defendant's right to confrontation and right to a fair trial, among other things.

Over defense objection, the trial court granted the People's petition for an order requiring Finch to answer questions pursuant to section 1324 [order compelling testimony], with use and derivative use immunity only. The trial court ruled that the jury could draw adverse inferences if Finch refused to testify. Finch was called as a witness, refused to answer prosecution questions regarding his height and where he lived in August 2011, and was dismissed. The trial court prepared a special instruction stating that the jury could draw inferences from Finch's refusal to testify, but the refusal of a witness to testify could not prove guilt by itself. However, the proposed instruction was withdrawn at the request of both parties.

Defendant's opening brief does not provide detailed argument or analysis regarding the right to confrontation or the right to a fair trial. Instead, he asserts that those rights were violated because Finch's conviction was not yet final and thus he still retained his Fifth Amendment privilege against self-incrimination. (See *People v. Fonseca* (1995) 36 Cal.App.4th 631, 636.) Defendant argues that because the jury may not draw adverse inferences from a witness who invokes the privilege against self-incrimination (Evid. Code, § 913, subd. (a); *People v. Frierson* (1991) 53 Cal.3d 730, 743), the jury was improperly permitted to infer defendant's guilt from Finch's silence.

6

But a witness may not refuse to testify based on the privilege against self-incrimination if he or she has been given immunity that is "coextensive with the scope of the privilege." (*Kastigar v. United States* (1972) 406 U.S. 441, 449 [32 L.Ed.2d 212, 219]; cf. *People v. Seijas* (2005) 36 Cal.4th 291, 305 ["Use of incriminating statements must be *forbidden*, as by a grant of immunity, and not merely *unlikely*, before the court may force a witness to make them"].)  "[I]mmunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." (*Kastigar, supra*, at p. 453 [32 L.Ed.2d at p. 222].)  Accordingly, because Finch was granted use and derivative use immunity, he could be compelled to testify despite his conviction and pending appeal. And "where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies.  Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony." (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554.)

Defendant further asserts that the grant of immunity was unfair and unequal. However, "[i]t is settled law that, absent a policy of unfair and unequal law enforcement, the prosecution may select the codefendant or coconspirator to whom immunity will be given.  [Citation.]" (*People v. Beyea* (1974) 38 Cal.App.3d 176, 204, disapproved on other grounds in *People v. Blacksher* (2011) 52 Cal.4th 769, 808.)  Defendant makes no more than a bare allegation without explaining why the grant of immunity is unfair and unequal; accordingly, we reject the contention.  In addition, his assertion that the grant of immunity is contrary to public policy, and thus is not permitted under section 1324, is likewise unfounded.  Defendant does not explain why granting Finch use and derivative use immunity was contrary to public policy.

Because Finch was granted use and derivative use immunity, the privilege against self-incrimination did not preclude his testimony, and the jury could draw adverse

7

inferences from his refusal to testify. The trial court did not violate defendant's right to confrontation or right to a fair trial.

II

Defendant next contends the trial court should have stayed sentence, pursuant to section 654, on the convictions for assault on High (counts 3 and 4), assault with a firearm on Baxter and Vasquez (counts 5 and 10), false imprisonment of Baxter and Vasquez (counts 6 and 7), and attempted false imprisonment of High (count 11). He argues the acts of false imprisonment, attempted false imprisonment and assault were incidental to, and part of the intent and objective of, the burglary conviction charged in count 2.

Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor. [Citation.] If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. [Citation.]" (*People v. Perez* (1979) 23 Cal.3d 545, 551.) "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence. [Citation.]" (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

8

Defendant aggregates the offenses by type rather than by victim, but his approach overlooks the multiple victim exception to section 654.  Under that exception, " 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.'  [Citations.]" (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)  "As the purpose of section 654 'is to insure that defendant's punishment will be commensurate with his criminal liability,' when he 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654.  [Citation.]" (*People v. Miller* (1977) 18 Cal.3d 873, 885 (*Miller*), disapproved on other grounds in *People v. Oates* (2004) 32 Cal.4th 1048, 1067, fn. 8.)

Burglary may or may not constitute a violent crime for purposes of the multiple-victim exception depending on whether it was committed in conjunction with an act of violence.  (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1090-1091.)  In *Miller, supra*, 18 Cal.3d at page 886, the defendant robbed Keating during a burglary of Burk.  The Supreme Court explained the section 654 consequences:  "In the instant case the victim of the robbery as alleged, proved and found to be true was John Keating who was accosted and threatened at gunpoint.  The robbery of a victim at gunpoint has been held to be an act of violence such as to preclude application of section 654 in the case of multiple convictions involving multiple victims.  [Citations.]  Although a burglary does not necessarily involve an act of violence against any person, sections 459 and 461 define the instant crime as a burglary in the course of which the defendant intends to and does inflict great bodily injury on an occupant of the premises burglarized.  Thus the burglary alleged, proved and found to be true is a crime of violence committed against Burk.  Defendant being convicted of a second crime of violence against a second victim, section 654 does not preclude the imposition of punishment for both the robbery and the burglary convictions." (*Ibid*., fn. omitted.)

Here, because the purpose of the burglary was to take High's marijuana by means of physical force with use of weapons, the burglary was a violent offense and thus subject to the multiple victim exception. Accordingly, rather than analyzing the sentences by offense, as defendant does, we will analyze them by victim.

A

We begin with the offenses against Vasquez. She was outside with High when they first saw the intruders. The intruders claimed to be police and ordered them to the ground. An intruder threatened to shoot Baxter's dog and Vasquez restrained it. When the intruder with the rifle went into the house and returned outside with Baxter, Vasquez and Baxter apparently remained with the intruder until he ran away.

The assault with a firearm committed against Vasquez was the means used to control Vasquez and falsely imprison her. The Attorney General argues there were two different points where the rifleman controlled her, with two different purported objectives: (1) when the rifleman initially pointed the rifle at her, the objective was to promote the theft of marijuana; and (2) when the rifleman held Vasquez next to Baxter after Vasquez had restrained the dog, the objective was to prevent Vasquez from going to the aid of High. We conclude, however, that the assault and false imprisonment offenses had the same objective: to control the victim in an effort to steal marijuana.[3]

---

[3] Although defendant did not raise this specific ground for modifying the sentence in his favor, we conclude that it is appropriate to decide the matter on this ground without additional briefing in the interests of justice and judicial economy. Our opinion does not raise a new contention, but instead applies a more accurate approach to defendant's contention. Moreover, one of the arguments advanced by the Attorney General in the respondent's brief -- that the intruders had two distinct objectives in committing the crimes against Baxter and Vasquez -- essentially argues against our resolution on this issue. In addition, our holding here -- that section 654 requires a stay of the false imprisonment counts against Baxter and Vasquez because they have the same objective as the assault counts against those victims -- is the same result we reached in the appeal of co-intruder Chane C. Finch. (*People v. Finch* (Aug. 22, 2013, C071606) [nonpub.

10

Accordingly, the sentence on the offense with the lesser penalty must be stayed. (*People v. Landis* (1996) 51 Cal.App.4th 1247, 1255.) False imprisonment by violence is punishable by a county jail term of 16 months or two or three years (§§ 18, subd. (a), 237, subd. (a), 1170, subd. (h)), while assault with a firearm is punishable by a state prison term of two, three or four years (§ 245, subd. (a)(2)). We will stay the sentence for false imprisonment of Vasquez (count 7) pursuant to section 654.

B

Next we turn to the offenses against Baxter. When defendant (who was the intruder with the rifle)[4] left Vasquez and went inside the house, he ordered Baxter to the ground. She ran outside, but an intruder struck her in the head and she fell next to Vasquez. Baxter apparently remained with the rifleman until he ran away.

The assault and false imprisonment of Baxter had the same objective, to control the victim in an effort to steal marijuana. We will stay the sentence for false imprisonment of Baxter (count 6) pursuant to section 654.

C

Finally, we address the offenses against High. Defendant argues the trial court should have stayed the sentences on the convictions for assault against High (counts 3 and 4) and attempted false imprisonment of High (count 11) because those offenses were incidental to the burglary charged in count 2.

Regarding the attempted false imprisonment conviction, the offenders attempted to falsely imprison High in an effort to burglarize his home. Thus, the attempted false imprisonment was incidental to the burglary. Because attempted false imprisonment is

---

opn.] slip op. at pp. 5-7.) The same Deputy Attorney General handled the Finch appeal and the instant appeal. Nonetheless, any party claiming to be aggrieved may petition for rehearing. (Gov. Code, § 68081.)

[4] The jury sustained the allegations that defendant was armed with the rifle as to each offense.

punished less severely than first degree burglary (§§ 664, subd. (a), 237, 461, subd. (a)), we will stay the sentence for attempted false imprisonment (count 11) pursuant to section 654.

Turning to the assault convictions, defendant was convicted for assault with a firearm (count 3) and assault with a deadly weapon (a knife, count 4).

In determining whether multiple crimes are part of a single purpose or plan, "the courts analyze the evidence to determine whether all the offenses committed were part of the defendant's original plan or some were an afterthought or acts committed in response to unforeseen developments." (*People v. Vidaurri* (1980) 103 Cal.App.3d 450, 465 (*Vidaurri*).) For example, section 654 did not prevent separate punishments for burglary and assault when the defendant in *Vidaurri* shoplifted some items from a store then swung a knife at a security guard who confronted him in the parking lot. (*Id.* at pp. 455, 465-466.)

Here, we conclude the assault with a firearm was incidental to the burglary. Defendant struck High in the face with the rifle butt in the initial confrontation and subsequently threatened to shoot High with the rifle during High's first attempted resistance. Those assaults were committed in an effort to control High as part of the plan to steal marijuana. Because the assault with a firearm was intended to facilitate the general plan of the burglary, we will stay the sentence for assault with a firearm (count 3) pursuant to section 654.

However, there is evidence that the assault with a knife (count 4) was not part of the original plan to steal marijuana but instead was in response to an unforeseen development: High's surprising and tenacious resistance to the intruders.

12

High's resistance to control by the intruders resulted in a prolonged pummeling, during which the trial court could reasonably conclude that High was stabbed.[5] As in *Vidaurri*, the trial court could impose separate punishments for the burglary and the assault with a knife committed in response to unforeseen resistance.

### III

Defendant was convicted of attempted robbery in concert on count 1. The abstract of judgment lists the correct code sections for that offense but describes it as attempted burglary. We shall order a correction to the abstract of judgment to describe the correct offense for count 1.

### DISPOSITION

The judgment is modified to stay the sentences on counts 3, 6, 7 and 11, resulting in an aggregate sentence of 12 years in state prison. The judgment is affirmed as modified. The trial court is directed to amend the abstract of judgment to reflect this modification and to correct the abstract to show that defendant was convicted of attempted robbery on count 1. The court is further directed to send a certified copy of the

---

[5] The trial court could reasonably conclude that High was not stabbed during his initial fight with the offender, because at that point High made room between himself and the offender after noticing the offender's sheathed knife. The trial court could also conclude that the offender did not stab High when he shot his pistol at High before High wrestled him to the ground. Instead, the trial court could reasonably conclude that High was stabbed when all three offenders "pummeled" him after he kicked away from the offender armed with a knife.

13

amended and corrected abstract of judgment to the Department of Corrections and Rehabilitation.

                                                                                     MAURO               , J.

We concur:

                  RAYE              , P. J.

                  ROBIE             , J.